IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


DONNA M. KALLMAN,

      Plaintiff,

vs.                                                                                                  No. CIV 04-1081 JC/DJS

LOVELACE, INC. d/b/a LOVELACE CHILD
CARE CENTER, ALBUQUERQUE POLICE
DEPARTMENT, and KATHERINE GARDUNO,

      Defendants.


**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on *Defendant Albuquerque Police Department and Katherine Garduno's Motion for Summary Judgment*, filed August 19, 2005 (*Doc. 31*).  Having previously dismissed the claims against Albuquerque Police Department, (*See Doc. 44*), the sole remaining question before the Court on this Motion is whether Katherine Garduno enjoys qualified immunity from this suit.  Having considered the Motion, the parties' submissions, the relevant authority, and being otherwise fully advise, the Court finds the Motion well-taken and it is, therefore, granted.

**I.     Background**

The following facts are either undisputed or viewed in the light most favorable to Plaintiff. Plaintiff was employed by Childtime Childcare ("The Center")  In early 2002, while changing the diaper of child Sheyenne L. for the first time that day, Plaintiff noticed Sheyenne's bottom was

bloody, red and raw. Plaintiff further observed dried feces on the child's bottom and no feces in the diaper, indicating that the child had not been properly cleaned from a diaper change prior to arriving at The Center. Plaintiff noted her concerns about the child's condition in writing on Sheyenne's daily chart, which was available to Sheyenne's mother, Ms. Chavez. Apparently, Chavez indeed became aware of the concerns Plaintiff had reported.

Subsequently, Sheyenne arrived at the Center wearing a new pair of shoes with velcro closures.[1] Sheyenne was repeatedly removing the shoes by pulling apart the velcro closures. After finding Sheyenne's shoes and socks removed several times, Plaintiff determined it was necessary to wrap tape around the girl's shoes and socks to prevent her from continuing to remove them. The first day Plaintiff taped the shoes, the tape was removed prior to Sheyenne's mother arriving to pick her up. The second day of shoe-taping, the tape remained on the shoes when Ms. Chavez came to get Sheyenne. Ms. Chavez reported the taping incident as abuse and Plaintiff was then visited and interviewed by Detective Katherine Garduno of the Albuquerque Police Department (APD).[2] Detective Garduno's interview of Plaintiff was mandated as part of a required investigation of the alleged abuse reported by Ms. Chavez. Detective Garduno neither arrested Plaintiff nor filed criminal charges against her.

Pending completion of the investigation and resolution of the matter, The Center placed

---

[1] According to Plaintiff, prior to this time, Sheyenne had been arriving at The Center wearing no shoes, in violation of The Center's policy requiring that all walking children wear shoes in case of an emergency evacuation.

[2] Plaintiff's theory is that Chavez lodged the complaint against Plaintiff in retaliation for Plaintiff's having reported her concerns that Chavez was neglecting Sheyenne. Chavez, however, is not a party to this suit.

Plaintiff on a six-month leave of absence.[3]  During that time, Plaintiff received several communications from The Center pertaining to its position regarding Plaintiff's employment. Specifically, on July 1, 2002, Doreen Kleinsasser, Center Director, wrote to Plaintiff explaining that Plaintiff was considered to be on personal leave while she was "clearing up the issue with the court and state licensing." Mem., Ex. D. That letter further advised Plaintiff that necessity might require that her position be filled while she was out, that if Plaintiff was able to return by September 8, 2002, she would be offered the first position for which she was qualified, and that if Plaintiff was unable to "obtain clearance" to return to work prior to September 8, she would be terminated. *Id*. At the close of the letter, Plaintiff was instructed that if her employment was indeed terminated, she could apply again as soon as the "issue was cleared up." *Id.* On October 4, 2002, Ms. Kleinsasser again wrote to Plaintiff, this time informing Plaintiff that her leave of absence had expired on September 8, 2002 and that, as a result of Plaintiff's failure to "obtain clearance from State Licensing," her employment had indeed been terminated on September 9, 2002. Mem., Ex. E. That letter further advised Plaintiff that she "may apply again as soon as [the] issue" was cleared up. *Id.*

With respect to Ms. Garduno, Plaintiff alleges that Garduno negligently interfered with Plaintiff's right to contract and conspired with other Defendants to have Plaintiff fired from her position at The Center.

**II.     Legal Standard**

    *A.     Qualified Immunity*

Qualified immunity shields government officials from individual liability under Section 1983.

---

[3] Because The Center has been dismissed from this lawsuit, the facts relating to its dealings with Plaintiff are incorporated herein solely for purposes of establishing background. *See Doc. 43*.

Government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Woodward v. City of Worland*, 977 F.2d 1392, 1396 (10th Cir. 1992) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The purpose of qualified immunity is to avoid excessive disruption of governmental functions and to resolve insubstantial claims in the early stages of litigation. *See Saucier v. Katz*, 533 U.S. 194 (2001).

Once a defendant pleads entitlement to qualified immunity, "the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a federal constitutional or statutory right, and (2) demonstrating that the right was clearly established at the time of the conduct at issue." *Baptiste v. J.C. Penny Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998). In order to meet this strict twofold burden, "the plaintiff must articulate the clearly established constitutional right and the defendant's conduct which violated that right with specificity." *Id.* at 1255. Only if a plaintiff successfully establishes both elements of the qualified immunity test does a defendant subsequently bear the traditional summary judgment burden of showing no genuine issues of material fact exists, entitling defendant to judgment as a matter of law. *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). This is so because qualified immunity is a defense against suit, and not simply liability. *See Stuart v. Jackson,* 24 Fed. Appx. 943 (10th Cir. 2001).

### III. Discussion

That said, the Court has strained to identify any federal constitutional or statutory right held by Plaintifff that Ms. Garduno has allegedly infringed upon. Sifting through Plaintiff's Response brief, the Court finds only bald allegations of a conspiracy among all named Defendants, extensive citation to inapposite cases involving various claims of discrimination, and a factually unsupported, general

theory of retaliation that simply cannot lie against Detective Garduno. Thus, the Court need not proceed in its analysis, for Detective Garduno is entitled to qualified immunity from this lawsuit.

WHEREFORE,

**IT IS ORDERED** that *Defendant Albuquerque Police Department and Katherine Garduno's Motion for Summary Judgment*, filed August 19, 2005 (*Doc. 31*) is GRANTED.

DATED November 30, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

Counsel for Plaintiff:

> Donald Sears, Jr., Esq.
> Steven K. Sanders & Associates, LLC
> Albuquerque, New Mexico

Counsel for Defendant Childtime Childcare, Inc.:

> Charlotte Lamont, Esq.
> Bannerman & Williams, P.A.
> Albuquerque, New Mexico

Counsel for Defendants APD and Katherine Garduno:

> Beatrice J. Brickhouse, Esq.
> Albuquerque, New Mexico